```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :
                                     :
        - v. -                       :
                                     :    12 Cr. 007 (KMW)
TONY EDWARDS, a/k/a LIONEL           :
EDWARDS,                             :    OPINION & ORDER
                                     :
              Defendant.             :
                                     :
- - - - - - - - - - - - - - - - - - x
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-6-12

TS

KIMBA M. WOOD, U.S.D.J.:

Defendant Tony Edwards ("Edwards") is charged in a one-count indictment with possession of a firearm following a felony conviction, in violation of 18 U.S.C. § 922(g)(1).[1]  Edwards moves to suppress (1) a 9mm Radom semi-automatic pistol, seized when he was arrested while riding as a passenger in a livery cab, and (2) his post-arrest inculpatory statements, on the ground that both the gun and the statements are the fruits of an unlawful stop and search made in violation of the Fourth Amendment.  For the following reasons, the Court finds that the stop and search did not violate the Fourth Amendment, and therefore DENIES Edwards' motion to suppress the gun and post-arrest statements.

---

[1] Edwards was convicted on or about May 24, 2000 in New York State Supreme Court, New York County, of Criminal Sale of a Controlled Substance in the Fifth Degree, a Class D felony in violation of New York Penal Law § 220.31, which is a crime punishable by imprisonment for a term exceeding one year.

1

I.  BACKGROUND

   A.  The Taxi/Livery Robbery Inspection Program ("TRIP")

In 1994, the NYPD launched TRIP to combat the high number of murders and robberies of drivers of taxi and livery cabs in New York City. See People v. Abad, 98 N.Y.2d 12, 14 (N.Y. 2002). The program is available to all owners of licensed taxis or livery cabs that operate in New York City. By joining the program, an owner agrees that police may briefly stop and visually inspect the enrolled vehicle at any time to check on the driver's safety. Id. at 15. The driver must also sign a consent form agreeing to the foregoing stop and check. Id. A participating owner is required to affix three decals to his vehicle to alert passengers and police on patrol that the vehicle is enrolled in the program; two are to be affixed to the outside of each rear side window, and one is to be affixed conspicuously in the interior of the rear passenger compartment. Id. The decals read, "This vehicle may be stopped and visually inspected by the police at any time to ensure the driver's safety." Id. A vehicle owner may cease participation in the program by removing the decals and notifying the precinct of record that he no longer wishes to be enrolled. Id.

According to the program's guidelines, police officers making a TRIP stop may open the passenger compartment doors only upon obtaining the driver's consent. Id. The officers may not

2

remove passengers from the vehicle absent "independent factors [that] cause the officers to fear for their own safety," and may not detain passengers absent reasonable suspicion of criminal activity. Id. Officers must also "maintain a detailed activity log of all TRIP stops, including information regarding the driver and the vehicle stopped." Id.

### B. Facts[2]

On December 17, 2011, two New York Police Department ("NYPD") police officers were on patrol in an unmarked vehicle in the vicinity of 167th Street and Morris Avenue in the Bronx, New York. (Compl. ¶ 2(a).) At approximately 2:00 AM, the officers received an NYPD radio report of a gunpoint robbery that took place approximately ten minutes earlier, four blocks away. (Compl. ¶ 2(b).) The report stated that the perpetrators were two black males who had fled in an eastbound direction. (Id.)

Shortly after receiving the radio report, the officers saw a livery cab (the "Livery Cab") located a few blocks southeast of the reported location of the robbery. (Compl. ¶ 2(c).) One of the officers ("Officer 1") observed that there were two

---

[2] The following facts are derived from the allegations contained in the criminal Complaint filed in this case on December 21, 2011, as well as an evidentiary hearing held by the Court on July 12, 2012. Unless otherwise noted, Edwards does not contest the Complaint's allegations.

3

passengers in the car, and that one of them was a black male.[3] (Id.)

The officers pulled behind the Livery Cab, whereupon Officer 1 observed a decal affixed to the outside of the vehicle, which indicated that the Livery Cab was enrolled in TRIP. (Compl. ¶ 2(d).) The Livery Cab's owner and the driver during the incident each submitted affidavits stating that the Livery Cab had only one decal, located on the bottom right corner of the rear window. (Aff. of Jose Nicolas Porte ("Porte Aff."), dated April 14, 2012 ¶ 3; Aff. of Ramon Vasquez ("Vasquez Aff."), dated March 15, 2012 ¶ 3.) The current owner averred that he never registered the vehicle with TRIP, but rather that the decal was already there at the time he purchased the Livery Cab from its prior owner. (Porte Aff. ¶ 3.) He stated that on the date of the stop, the Livery Cab was not registered with TRIP. (Id. ¶ 4.) Similarly, the driver stated that he has neither personally registered with TRIP nor signed a form consenting to police searches of the vehicle. (Vasquez Aff. ¶ 4.)

---

[3] At a July 12, 2012 evidentiary hearing held by the Court, the officer testified that he was unable to ascertain any identifying characteristics of the other passenger. (Evid. Hrg. Tr. 33-34, July 12, 2012.) The second officer, who also testified at the hearing, stated the same. (Evid. Hrg. Tr. 82-83.)

4

Upon seeing the decal, the officers activated their police lights and siren in order to stop the Livery Cab. (Id.) Once the Livery Cab stopped, the officers approached the vehicle while shining their flashlights into the vehicle's rear window. (Compl. ¶ 2(e).) Officer 1 saw Edwards sitting in the rear passenger compartment on the driver's side of the Livery Cab, and a woman sitting on the opposite side of the rear passenger compartment, whom Edwards later identified as his girlfriend. (Id.) As Officer 1 approached the Livery Cab, he saw Edwards bend over at the waist and then sit back up. (Compl. ¶ 2(f).)

The Complaint alleges that Officer 1 proceeded to approach the driver's side of the Livery Cab, in response to which the driver rolled down his window. (Compl. ¶ 2(g).) The Complaint further alleges that Officer 1 told the driver that he was performing a safety inspection. (Id.) Edwards contends that the officer did not communicate with the driver at that time, and contends that no law enforcement official spoke with the driver until after Edwards' arrest. The driver, by affidavit, stated that as the officers approached the Livery Cab, his window was rolled up and neither officer spoke to him at all. (Vasquez Aff. ¶ 8.) However, when the driver testified at the evidentiary hearing, he stated that upon being pulled over and seeing an officer approach, he lowered his window, whereupon the officer spoke to him in English, which he did not understand and

5

to which he did not respond.[4]  (Evid. Hrg. Tr. 10-11.)  The driver testified that he never told Edwards' private investigator, who prepared the affidavit, that the officers did not speak to him when they approached the vehicle.  (Id. at 22-23.)  The investigator, who also testified at the hearing, confirmed that the affidavit was inaccurate in this respect.  (Id. at 106-07.)  The driver also stated, both in his affidavit and at the hearing, that, following Edwards' arrest, a third officer arrived and explained to him in Spanish that Edwards had been arrested for possession of a gun.  (Id. at 22-23; Vasquez Aff. ¶ 11.)

The Complaint alleges that as Officer 1 approached the vehicle and passed the rear passenger window on the driver's side, he observed, in plain view, a white plastic bag and the hammer of the gun on the floor in front of Edwards. (Compl. ¶ 2(h).)  Consistent with that allegation, at the evidentiary hearing, Officer 1 testified that, upon shining his flashlight through the rear window, which was closed, he saw "a white like small type shopping bag that you get from a regular store.  And underneath that I saw the rear section, hammer and the rear butt of a pistol . . . in between the defendant's feet on the floor behind the driver's seat."  (Evid. Hrg. Tr. 39.)  Officer 1

---

[4] At the hearing, Officer 1 testified that he asked him to unlock the vehicle's doors, and that the driver did so in response. (Evid. Hrg. Tr. 42.)

further testified that the bag "was on top of [the gun] covering pretty much from the - - just past the end of the butt forward towards the barrel." (Id. at 41.)[5]

Officer 1 asked Edwards to exit the vehicle; as Edwards did so, Officer 1 saw additional portions of the gun on the floor. (Compl. ¶ 2(h).) Officer 1 then placed Edwards and his girlfriend under arrest, (id.), after which Officer 1 retrieved the gun from underneath the white plastic bag. (Compl. ¶ 2(i).)

As Edwards was being led to the officers' car to be transported to an NYPD precinct, he looked in his girlfriend's direction and spontaneously stated, in substance and in part, "It is mine. My girl had nothing to do with it. What you found in the car is mine." (Compl. ¶ 3(b).) Once Edwards arrived at the precinct, the officers advised him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Compl. ¶ 4.) The Defendant signed a written waiver of his Miranda rights and

---

[5] In his brief in support of his motion to suppress, Edwards argues that it is implausible that an officer could have plainly viewed the gun's hammer, at night, through a car window, and partially covered by a plastic bag. (Def.'s Mem. of Law in Supp. of Mot. to Suppress at 19.) Edwards requested an evidentiary hearing in order to test the officer's claim via cross-examination. As noted, the Court held such an evidentiary hearing, during which the officer gave testimony consistent with the Complaint's allegations, including demonstrating how the gun was placed. Cross-examination did not reveal any inconsistencies, and there was no testimony given by any witness that contradicted the officer's statements. The Court credits the officer's testimony and rejects Edwards' argument that it was impossible for part of the firearm to have been in plain view.

agreed to be interviewed by the officers. (Compl. ¶ 5.) During that interview, he stated orally, in substance and in part, that the gun found in the Livery Cab was his and that he had purchased it two weeks before the date of his arrest. (Compl. ¶ 4.)

Edwards now moves to suppress the gun and his post-arrest statements, arguing that: (1) the stop was not made in compliance with the TRIP program's requirements, such that the police needed -- and lacked -- reasonable suspicion to make the stop; and (2) the post-stop search of the Livery Cab violated the Fourth Amendment because the police did not have probable cause to conduct the search, given that it was unlikely that the hammer of the gun could be seen in plain view.

## II. THE STOP OF THE LIVERY CAB

Edwards argues that the stop was not a lawful TRIP stop because the officers did not adhere to certain of the program's guidelines. He contends that the officers thus needed reasonable suspicion to make the stop, as is usually required for warrantless seizures. See Terry v. Ohio, 392 U.S. 1, 30 (1968). The Government does not claim that the officers had reasonable suspicion to stop the Livery Cab. Therefore, the

only question is whether the officers' failure to comply with all of the TRIP guidelines rendered the stop unconstitutional.[6]

### A. Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 356 (1967). Generally, police may conduct a warrantless seizure only when they have a reasonable suspicion, grounded in specific and articulable facts, that criminal activity is ongoing or may be imminent. See Terry, 392 U.S. at 30.

In the absence of reasonable suspicion, warrantless seizures may be upheld only where reasonable, which is

---

[6] Edwards also contends that the TRIP program as a whole is unconstitutional because the police are either not trained in, or routinely do not follow, the program's guidelines. He argues that, although the New York Court of Appeals has upheld the constitutionality of TRIP as the program exists on paper, see People v. Abad, 98 N.Y.2d 12 (2002), the NYPD's failure to execute the program according to those guidelines renders it unconstitutional in practice. This Court takes seriously the proper administration of TRIP. However, because the individual stop in this case was reasonable, this case is not an appropriate forum in which to test whether the NYPD has systematically failed to execute TRIP in a manner that renders the program unconstitutional.

determined by balancing "the public's interest and the individual's right to personal security free from arbitrary interference by law officers." Brown v. Texas, 443 U.S. 47, 50 (1979) (internal quotation marks omitted). In Brown v. Texas, the Supreme Court enunciated three factors that a court should consider in its analysis: (1) the gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty. Id. at 50-51.

In People v. Abad, 98 N.Y.2d 12, 17 (2002), the New York Court of Appeals held that TRIP "properly balances the competing interests under Brown." As to the first factor, the Court identified the public concern served by the program as the "acute public interest in preventing crime against livery cab drivers." Id. With respect to the second factor, the Abad Court found that TRIP effectively served that public interest by prohibiting police from making random patrol stops, and instead requiring that they stop only those vehicles whose owners choose to participate in the program. Id. at 17-18. As to the third factor, the Court found that the procedures governing TRIP stops sufficiently mitigated the severity of the intrusion upon personal liberty. The Court noted that intrusiveness was objectively limited because police could stop only vehicles bearing TRIP decals, could not remove passengers absent

10

independent reason to detain them, and were required "to complete a detailed activity log for every stop made, which affords the possibility of 'post-stop' judicial review to the extent questions are raised as to the actual operation of the program." Id. at 18. The Court further noted that "subjective concerns, such as the potential for fear on the part of passengers, are mitigated by the consent of the driver and the display of decals that notify passengers that the vehicle might at any time be stopped and visually inspected by the police." Id. In light of its findings, the Abad Court held that TRIP passed constitutional muster, at least when executed in accordance with these procedures.

Notably, however, Abad did not hold that a failure to comply with all of the program's guidelines would render a TRIP stop unconstitutional. Indeed, the Court upheld the stop made in that case after specifically rejecting the defendant's argument that the stop was illegal because the cab did not contain a TRIP decal in the interior passenger compartment, as required by the program. The New York Appellate Division, First Department, took a similar approach in People v. Moreno, 30 A.D.3d 252, 253 (1st Dep't 2006), when it upheld a TRIP stop despite the fact that the police potentially violated the program's guidelines when they ordered the defendant out of the stopped cab without cause. The key consideration for these

11

courts appears to be whether, in light of the circumstances, the failure to comply with a particular guideline was reasonable. Id.; Abad, 98 N.Y.2d at 19. This Court deems this a sound framework within which to examine the alleged failure of the police to adhere to several TRIP guidelines in the instant action.

### B. Failure to Adhere to Certain TRIP Guidelines

#### 1. *Lack of Actual Consent from the Owner or Driver*

Edwards argues that the officers could not lawfully make the stop in the first instance because the Livery Cab was not enrolled in TRIP, despite the presence of at least one[7] TRIP decal on the rear passenger window. He contends that because the car's current owner and driver did not consent to participation in the program, there was no actual consent that would permit the officers to execute a TRIP stop.

However, any absence of actual consent was insufficient to invalidate the stop because the presence of the TRIP decal was sufficient to permit the officers to objectively and reasonably

---

[7] At oral argument, Edwards contended that the police officers should have known that the Livery Cab was not enrolled in TRIP because only one decal, as opposed to two, were displayed on the vehicle's outside rear window. (Evid. Hrg. Tr. 5-6.) The Court sees no basis for this distinction. Edwards further contends that the absence of a sticker in the interior of the passenger compartment deprived him of notice that the vehicle could be subject to a TRIP stop. However, Edwards was on constructive notice based on the decal displayed on the exterior of the cab. See Abad, 98 N.Y.2d at 19.

12

believe that they had consent to make the stop. See Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) (finding search constitutional when "the facts available to the officer[s] . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises") (internal quotation marks omitted). The presence of the decals created the appearance that the Livery Cab was duly enrolled in TRIP and that the driver and owner had consented to searches of the cab in accordance with the program's rules. It was therefore objectively reasonable for the officers to believe that they could properly stop the Livery Cab pursuant to TRIP.

### 2. Failure to Inquire about Driver's Safety or Seek His Permission to Open Passenger Door

In his brief in support of the instant motion, Edwards contended that the TRIP stop was also invalid because the officers failed to inquire about the driver's safety and failed to seek his permission to open the passenger door. In support of this contention, Edwards filed an affidavit signed by the driver, in which the driver stated that no officer spoke to him until after Edwards had been arrested. (Vasquez Aff. ¶ 8.) However, at the evidentiary hearing, Officer 1 testified that he asked the driver to unlock the passenger door before asking Edwards to step out of the vehicle, and the driver himself testified that the affidavit submitted on his behalf was

13

incorrect, and that he did speak with one of the arresting officers prior to Edwards' arrest. (Evid. Hrg. Tr. 10-11; 22-23; 42.)

Even if Officer 1 had failed to ask the driver to open the passenger door, the fact that he had seen the portion of a gun in plain view at Edwards' feet provided "independent reason to detain [him]." Abad, 98 N.Y.2d at 18. Furthermore, the fact that Officer 1 may not have specifically inquired about the driver's safety is insufficient to suggest that the stop was unlawful, particularly in light of the fact that the officer had already identified the potential danger when he observed the gun's hammer while approaching the vehicle and pointing his flashlight into the interior of the car.

### 3. Absence of Activity Log

Finally, Edwards contends that the stop is unlawful because the officers failed to record the stop in an activity log, as required by the TRIP protocol. The officers failure in this instance to complete a separate TRIP log[8] is not sufficient to invalidate the stop. The purpose of the requirement is "to afford[] the possibility of post-stop judicial review to the extent questions are raised as to the actual operation of the

---

[8] Officer 1 did contemporaneously memorialize the stop in his regular notebook, including the detailed information required by TRIP (e.g., TRIP decal number, license plate and registration numbers, etc.), but he did not create a separate activity log as required by the program.

14

program." Abad, 98 N.Y.2d at 18 (internal quotation marks omitted). In this case, Edwards was afforded considerable post-stop judicial review, including the opportunity to cross-examine the officers who arrested him. The Government also provided, at the evidentiary hearing, Officer 1's contemporaneous record of the stop in his regular notebook.[9] The absence of an official activity log thus did not deprive the Court of the ability to review the facts of the stop as recorded by the arresting officer.

### III. POST-STOP SEARCH OF THE LIVERY CAB'S PASSENGER COMPARTMENT

The Defendant argues that, even if the initial stop that led to the search of the Livery Cab passes constitutional muster, the post-stop search of the passenger compartment does not, because the officers did not have probable cause to search the compartment pursuant to the Fourth Amendment's "automobile exception," which permits law enforcement to conduct a warrantless search of a vehicle, and the containers within it, where they have probable cause to believe that contraband or evidence is contained therein. See California v. Acevedo, 500 U.S. 565, 580 (1991); United States v. Navas, 597 F.3d 492, 497 (2d Cir. 2010). As noted, Defendant contends that the officers lacked probable cause because an officer could not have plainly

---

[9] To the extent that the record was undated, the Court finds credible Officer 1's testimony that he created the document on the evening of the arrest.

15

viewed the gun's hammer, at night, through a car window, and partially covered by a plastic bag. However, as discussed in Part I.B n.5, supra, the evidence adduced at the evidentiary hearing was sufficient to support the Government's claim that a portion of the firearm was in plain view. Upon seeing the hammer of the gun, the officers could lawfully conduct a warrantless search of the Livery Cab, pursuant to the automobile exception.[10]

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion to suppress is DENIED.


SO ORDERED.

Dated:    New York, New York
          August 6, 2012

                              _____
                              Kimba M. Wood
                              United States District Judge

---

[10] The Government contends that Edwards lacks standing to challenge the search in the first place because he did not have a reasonable expectation of privacy in the passenger compartment. However, the Court need not address whether Edwards would have standing to bring the claim because, in light of the Court's finding that the officers had probable cause to search the vehicle, the claim fails on the merits.